Good morning, Your Honors. Carol A. McCourtney appearing for the appellant, Maria Franco. The undisputed, with respect to the implied in fact contract, the undisputed facts in this case disclosed that by its conduct, defendant intended that the parties be bound by the employment agreement without inclusion of at-will language contained in the employment application. Counsel, let me get to an issue that's past that and would operate the same way whether it's at-will or for cause and whether we're looking at a contract claim or disability claim. And that's the cause. What it looked like to me, and I want you to educate me because you know this record better than I do. It looked like to me she didn't show up to open the warehouse at midnight or 1 in the morning. No, 4.30 a.m. 4.30 a.m.? Yes. And right after New Year's, she called her boss at 1 in the morning and asked that somebody else open it, and the night shift operations manager wound up opening it himself. And then she got fired, and it looked like she got fired for not opening the warehouse when she was supposed to. And all you really had to show pretext was that one other guy once failed to open the warehouse when he was supposed to and he didn't get fired, but he'd been working for him for a long time and he had a better record. Tell me what I'm missing there. Okay. What you're missing, Your Honor, is that the ‑‑ with respect to the procedure or the duty of the plaintiff, the duty of the plaintiff in this case, because she didn't open the warehouse, like any employee of a defendant, was to inform her supervisor in sufficient time for the supervisor to do what was necessary to replace her. I thought her duty was to open the warehouse. No. No. I mean, you can't show up for work or not long as you inform? No. No. The point is that this came under a provision of the guidelines for the defendant employer with respect to absence from work. And so she was absent from work, and there's no provision prohibiting absence from work. The only requirement was that she ‑‑ That sounds bizarre to me. Like I can show up for work or not long as I let people know I'm not showing up that day? Yes. Yes. Why not? What if you're injured in a car accident? Usually you don't hire people. What if you're injured in a car accident or, as in this case, her brother had had a stroke? And so she knew by approximately ‑‑ The reason she didn't show up is her brother had a stroke? I didn't see that. Oh, yes. Approximately midnight. She was supposed to show up at 4.30 a.m. Approximately midnight, she learned, or shortly thereafter, she and family members suspected that her brother, who had sustained paralysis on one side of his face, had ‑‑ and therefore they, with great concern, they sought emergency care for him, which he participated in. This would have, at around 12 o'clock, or 12.30 I think it was, she realized that she would not be getting any sleep in order to open up at 4.30, which means that she was potentially endangering not only her own health but defendants' welfare if she appeared on the premises in order to direct the employees on the shift to ‑‑ as to their work. Was it ‑‑ it really wasn't that she didn't show up. It's the complaint, I think, that Ms. Green had was that she didn't follow the proper procedures for emergency notification. That's right. That's the complaint. That really is the issue, Your Honor. And the procedure to follow was to follow her ‑‑ to inform her supervisor. That was the only provision required, to inform her supervisor. The complaint, but I think the problem was she was supposed to inform ‑‑ she was not supposed to leave a voicemail message. Your Honor, I can't ‑‑ I'm sorry, I can't hear you. Okay. I'm sorry. I have ‑‑ I speak quietly. Okay. So what she did was leave a voicemail message for two people, and that was contrary to the guidelines that she was supposed to file. No, it wasn't. No. She left a voicemail with Green, and when Green did not pick up ‑‑ and by the way, there ‑‑ Rios testified later that he didn't know that Green even had the duty to answer such a message. But the point is that then she calls the night supervisor. Actually, she tried to call the other daytime supervisor, who likewise did not respond. So what she calls is the night operations manager, Bedillo, and tells him the problem. And while she is on the phone with him, on a ‑‑ he places a call with an attempt to reach both the other daytime supervisor and Green, the operations manager, with no response. And so he tells her finally, he said, I'll take care of it. He says, I'll notify them, and I'll take care of the problem. So what he does is he continues to try to reach them and was unable at approximately 312 a.m. in the morning to reach anyone. So he notifies them by e‑mail, which is in the record, that he was unable to reach them and that he would stay and open up the premises, which he did. So there was no loss to suffer by defendant. Now, this is in marked contrast to what happened with Reggie Smith the year before. Of course, the parties, Reggie Smith and plaintiff, were similarly situated. I don't know about similarly situated. This person has ratings of ‑‑ five ratings of unsatisfactory, two ratings of needs development, two ratings of good, no outstandings or very goods. And he had much better ratings, and he was there for a much longer time. But what difference would that have, Your Honor, with respect to the issue at question? That has nothing to do with it. Well, I think they felt that she didn't follow the procedure, and then she chose not to show up. Where this Mr. Smith actually, like, his alarm didn't go off, and at the moment that he realized that there was a problem, he runs down to work and does that. And plus, he had been an exemplary employee. So there is a difference in that to me, whereas I think it's undisputed that your client had performance issues. Mr. ‑‑ the ‑‑ at first place, plaintiff has told on two different occasions what her shortcoming was with respect to this particular failure. When she talked directly with Rios on the 7th, the first meeting between them, all he said to her was that she should have continued to call green, try to call green. And then in his deposition he said she was irresponsible because she did not open the warehouse. But where the parties were similarly situated, Reggie Smith and the plaintiff, they were both supervisors with a duty to open early. Reggie Smith overslept, but did he make an attempt to inform any of his superiors of his absence? If we were to publish an opinion saying just what you've just said, then stores would feel obligated to fire exemplary employees who'd worked there for 20 years or else lose their possibility of firing somebody who just started and was doing a terrible job. They shouldn't fire them in either ‑‑ our objection in Reggie Smith's case is not that he was disciplined. He shouldn't have been disciplined. Absolutely not. It was an oversight. And the point was that he made no effort to contact anyone. He ‑‑ approximately an hour to 45 minutes later, he appears at the warehouse without having informed anyone and the employees have been locked out. Now, if you look at Reggie Smith's case,    He's been involved in a number of cases. He's been involved in a number of cases. You know, this keeps getting away from me. I had thought we were talking about disability discrimination. Yes. But her brother's paralysis has nothing to do with her chronic fatigue and her small ulcer. Oh, it's not claimed that it does. And her termination has nothing to do with them. It has to do with not showing up and not informing. Your Honor, let me point out something with respect to the disability discrimination. If you look at page 459 of the record, you'll see that the district court has improperly used nondiscriminatory reasons for her termination in response to her evidence of discriminatory conduct. Well, I think you get into the pretext. I mean, she said what her reasons were. They gave other reasons. They said she was a poor performer and she didn't open it. Then it goes to pretext. And your evidence of pretext, my understanding, was this Mr. Smith and that you also claimed that there was a comment made that if, you know, maybe with all your health problems, this isn't a good time to work at Pier 1. Okay. But it's more complex than that, Your Honor. I had a concern with the absence of record on this conversation that took place. I think your strongest claim is this disability discrimination because, and I don't know if there's enough there in the record to have created a triable issue of fact or not, but, yes, there was this, she did have a history of some poor performance evaluations and she failed to open the warehouse. But she wasn't fired after either of those corrective actions. She was not fired until after, I guess according to her, she had a conversation with Green where she said, yes, and I've been sick and now I'm going to have to take off even more time in the coming year. And she was fired within a month of that. Within six days, Your Honor. I'm sorry. She was fired within six days. Okay, six days. So you have the temporal proximity argument on your behalf. And you also have evidence that Green met with Rios. Rios was the decision-maker. Do you have any evidence that Green told Rios not only is she a poor performer and she failed to open the warehouse one morning, but she's going to be out of work for months again. You know, that was part of the problem was her issues with her illness. And that's when they decided to fire her. They didn't decide to fire her until after she had seen her doctor and that information came out. That's right. And, in fact, the criticism of her work was unrelated. Yeah, it was unrelated to this. They couldn't have fired her at any point before this meeting where she said they had this conversation. But they didn't. They fired her after. But I'm asking you about where is the evidence in the record about who said what to whom in this particular meeting? Okay. The meeting with Green. Are you speaking with Green and the plaintiff? The meeting with Green where she allegedly, where she told her, according to your client, she told her that she was said she was even worse than she thought and she was going to be out for a few months next year. And Green allegedly said with all your problems, no, you shouldn't be working here. That's in plaintiff's declaration. And Green in her declaration does not respond, does not refute it, and does not respond to it. What's the deposition testimony? I don't mean deposition. I mean in Green's declaration. Green's declaration makes no mention whatsoever of the conversation had between them on the 5th of January, the day after the incident. So on the summary judgment standard, you put in evidence that your client testified in deposition that she had this conversation with Green and that was Green's response. Yes. The factually record is she was fired six days later. And there's nothing, no statement by Green to say? Nothing, nothing. There's nothing in her declaration. There's never been. You keep talking about declarations and Judge Wardlock keeps asking about depositions. What happened in the depositions? There's no, this, there was no deposition taken of Green. This was a, they relied upon a declaration by Green in support of their motion for summary judgment. I took the deposition of Rios in which he admitted that he had not followed the procedures with respect to her termination, which was customary. And it was Rios who made a total disclosure of the Reggie Smith situation. Let me add another bit of pretext here. I have a question that I can't find anywhere in the record where your client claims that her poor performance has anything to do with a medical disability. Is that anywhere in your complaint or anywhere in the record? Oh, yes, of course. Where? Cite me to the record on that. The whole series of the discussion that she had with Green, for which, by the way, Green made no declaration in opposition to that. You're way over time, so how about giving us the page numbers in response to Judge Callahan's question? Oh, okay. With respect to Green, I'm sorry. What I want is, I can't find in the record where your client ever told anyone  or where in your complaint that you're claiming that her poor performance is a result of her medical condition. You don't know where it is off the top of your head? No, I don't, Your Honor. Well, I don't know. I don't know if we want to. I don't know that we want to spend the time flipping through that. Your time has expired. All right. Why don't you write down for us the excerpts of record pages that we could look at and hand the paper to the clerk of the court on that subject? All right. Okay. Where, in effect, she told about. Now, by the way, it's admitted. Counsel, your argument time has expired five and a half minutes ago. I'm sorry, Your Honor. Okay. Why don't you just do what Judge Callahan and Judge Wartham have requested? Thank you, Your Honor. Thank you. Counsel. Good morning. Russell Collier on behalf of Pier 1 Imports. May it please the Court. Counsel, why don't we just skip to it? In my view, it's pretty clear that she was an at-will employee. Secondly, there is the record of poor performance, and I'm not sure Reggie Smith is similarly situated. Okay. The thing that really, really concerns me in this case, though, is she had this poor performance. She had corrective reports. Right after she didn't open the warehouse, she had a conversation with Ms. Green about how are you going to make sure that you follow the proper procedures, and it was a constructive kind of thing. But she was not terminated until after she had the conversation with Green, where she testifies that she told her she had just been to her doctor, her condition was worse than she thought, and she was going to be out on disability for a few more months. Then you have Green consulting with Rios. I don't know what was said between Rios and Green. That's sort of an empty thing. But it does give rise to the inference in my mind that if they had all this other stuff to fire her, why didn't they just fire her? Why did they wait until after they found out that she was sicker than she thought and she'd be missing a lot more work and be on disability? What you have in the summary judgment record that was before the court is that the plaintiff had told Ms. Green as early as February 2006, almost a year before, that she had these medical conditions. Isn't that in dispute? I mean, yes, she had certain medical conditions, but according to her testimony, plaintiff's testimony, she had gone in for tests and just learned that they were a lot worse than she thought. And according to the standard that this Court must review this record under, you have to take that as true. Right. That's why there's no dispute in Ms. Green's affidavit that she did not say that, because if there's a dispute, you would have to resolve it. Yeah, that's my question here. If there is this dispute and we don't know, we know Green talked to Rios, but we don't know what was said. Have you put in, I mean, has she put in evidence? Is there a triable issue of fact here? No, there is not. Well, you have to, I think Judge Wardle and I are sort of focusing on the same area in that I don't think that she's ever, I don't think she alleged previously that her poor performance was a result of her medical problems. That doesn't, I don't see that in the record. But on the issue of pretext is, yeah, she's a poor performer, undisputed. She has medical problems, undisputed. But there is this conversation on January 5th, which gives temporal proximity, and then she gets fired for not opening the warehouse. So why doesn't that raise a material issue? Because temporal proximity alone cannot establish pretext as a matter of law. And there is evidence in the record, undisputed evidence, that Rios was not aware of this medical condition, both in Mr. Rios' affidavit, Ms. Green's affidavit. They both say they were never told that she had these medical issues and they never discussed that, and that's undisputed. Where do we find that? In Rios' affidavit, which is at the record at pages 44 and 45, and Ms. Green's affidavit is in the record at page 59. But according to Franco's testimony, she did inform Ms. Green of the new medical evidence, that it was much more serious. And we do know, because it's in either Green or Rios, that Green consulted with Rios about the termination. Now she says and he says that we didn't talk about the fact that her physical condition had been seriously worsened, but Franco says they did. So why isn't, Franco says she did talk to Green about it. And on this record, there's no dispute, on this record. She's also entitled, not only is she entitled to us looking at the facts in her favor, in the light most favorable to Franco, she's also entitled to all reasonable inferences. And I guess the inference I draw from the fact, I mean, okay, these things were terrible, some of these performance reviews and not opening the warehouse and not other, you know. Okay. So why wasn't she fired then, immediately? Why was she given this constructive conversation about how are you going to fix it, if it wasn't the additional information about the degree of her injury or her problem, and that she was going to have surgery and it was going to take her out of work for a while? It was the additional act of failing to open the warehouse. And as the record indicates, she did not open the warehouse on January 4, 2007. The next day, she has the conversation with Green about why you didn't open the warehouse, and this conversation that we're focused on supposedly occurs. And it's only, so there's only one day after this last incident of misconduct, this longstanding misconduct. Mr. Rios then conducts an independent investigation. Did he actually follow company procedures in conducting that independent investigation? I believe he did, Your Honor. Isn't there some testimony to the fact that he didn't? I don't recall that. I recall the record indicating Mr. Rios investigated. There's e-mails showing that he talked with Mr. Ceballos, who was the night manager. He certainly met with Ms. Franco to get her side of the story on January 8. So Mr. Rios' independent investigation is an intervening act which disconnects this supposed comment that Green makes or that Franco makes to Green about the matter. Let me see if I understand this right. Rios actually made the decision to fire Franco, is that right? Yes, Your Honor. And Rios testifies or swears in his declaration that he never knew Franco had any kind of medical problems or had talked to anybody about needing time off because of medical problems or anything like that. That is absolutely correct. And Ms. Franco concedes that she never told him that either. But did he consult with the woman that she had told it to about before he made the decision of whether she should be fired? They consulted about the failure to open the warehouse. Then Mr. Rios independently interviewed Ms. Franco two days later about her failure. Hold on. Listen to the questions because I keep getting off on rabbit tracks here. Green did know about the medical problems and the statement, I'm going to need more time off because of my medical problems. Yes. Now, Rios says, nobody ever told me, which embraces Green never told me. Yes. Is there any evidence suggesting by inference that Green did tell Rios? Absolutely not. And how long a time was there between her failure to open the warehouse or give proper notification and when she got fired? Seven days. And what was happening during the seven days aside from her telling Green that I have these illnesses and I'm going to need a lot of time off? Mr. Rios was investigating. He spoke with Mr. Ceballos and he spoke with Ms. Franco. And he spoke with Ms. Green, right? He spoke with Ms. Green. Didn't Ms. Green go to him and talk to him and recommend the firing? Absolutely not. Ms. Green went to Mr. Rios to inform him about the failure to open the warehouse. She did not participate in the decision at all. That on this record is also undisputed. At Record 59, Paragraph 19. Well, okay. And I guess Rios' declaration says Ms. Franco's employment with Pier 1 was terminated because of her unsatisfactory poor performance. There were no other reasons for her termination. So he's not saying failure to open the warehouse. Failure to open the warehouse is unsatisfactory poor performance, along with the longstanding line of poor performance that she'd had for almost a year. And what is your response to your adversary's argument that there's a genuine issue of fact about whether her firing was because of her telling Green that her illness was going to require a lot of time off? There is no genuine issue of fact on this record. In fact, to show pretext, you have to show that the reason is untrue. Ms. Franco, even in her deposition, admitted that she believed that the reason for her separation was her longstanding poor performance. Where is that? She was unable to identify any facts. I'm sure you have a yellow tab on it, a yellow sticky, and it's marked up. Just tell us the page number. If you don't have a yellow sticky and it's not marked up, forget it. I don't. It's in our brief, though, Your Honor. Thank you very much. Okay. I was going to give you an opportunity to respond to Ms. Franco. Please go ahead and respond to Judge Wardlaw's question. Green's declaration says after her meeting with Ms. Franco to discuss the corrective action to ensure that this issue would be resolved, that she was going to talk about it with Mr. Rios. And that was the same conversation where Ms. Franco says that she was ill. And there's no response from Green as to that allegation. Is there any response anywhere in the record? Not in the record. I think the Court has to, on this record, take what Ms. Franco says occurred in that conversation as true. Okay. So I'm still left with this fact that that came up then, and then according to Green's testimony, she went and talked to Rios, and then next thing you know, she's fired. So I guess I'll just have to mull on that, what inferences can be drawn from that. Thank you. Thank you. Thank you, counsel. Franco v. Pier 1 is submitted. Yes. Thank you, counsel. Thank you. We'll hear Clemens v. City of Long Beach.
judges: Kleinfeld, Wardlaw, Callahan